FLOWER and others *v.* CITY OF DETROIT and others.

(*Circuit Court, E. D. Michigan.* November 17, 1884.)

1. PATENTS FOR INVENTIONS—REISSUE NO. 6,990—CLAIM 1—VALIDITY.
   The first claim in reissued patent No. 6,990, granted March 14, 1876, to Thomas R. Bailey, Jr., for an improvement in hydrants, is not only an expansion of the claim in the original patent, but an attempt to introduce an entirely new invention, neither claimed nor suggested in that patent, and is void for that reason and because of the laches in allowing a period of eight years to elapse before applying for a reissue.

2. SAME—CLAIMS—REISSUE—LACHES.
   The claim of a specific device or combination, and an omission to claim other devices or combinations, are in law a dedication to the public of that which is not claimed. The legal effect of a patent cannot be revoked unless the patentee, with all due diligence and speed, surrenders it and proves that

the specification was framed by real inadvertence, accident, or mistake, without any fraudulent or deceptive intention on his part. It will not do for him to wait until other inventors have produced new forms of improvement, and then, with the new light thus acquired, under pretense of inadvertence and mistake, apply for such an enlargement of his claim as to make it embrace these new forms.

3. SAME—CLAIM 3—CONSTRUCTION — ANTICIPATION—RACE & MATHEWS PATENT. The third claim of reissue No. 6,990 must be construed as for a casing wherein the end play is confined by an overlapping flange, and, thus interpreted, is anticipated by the Race & Mathews patent of 1858.

In Equity.

This was a suit for the infringement of reissued letters patent No. 6,990, granted March 14, 1876, to Thomas R. Bailey, Jr., of Lockport, New York, for an improvement in hydrants. The bill, after averring in the usual form the granting of the original patent No. 75,344 to Bailey, dated March 10, 1868, set forth that in February, 1876, plaintiffs, being about to acquire an interest in the invention, "only by the aid of skillful solicitors learned in the law, and after careful examination of the letters patent, and the papers and model on file and deposit in the patent-office" with the application therefor, first learned that said letters patent were inoperative and invalid by reason of defective and insufficient specifications, and that such defect arose through a discrepancy between the drawing, forming part of the specification, and the model; that one of the distinguishing features of the invention consisted in a loose casing around the tube or upright part of the hydrant, connecting the same with the water-main or horizontal part thereof, fitting the same like a sleeve, resting, when in proper position, with its lower end upon the water-main, or flange thereof below, so as to slip up on the said tube, which feature was fully shown and properly exhibited in and by the said model, but was not shown in the drawing, for the reason that the drawing was made by the attorneys of Bailey from the model, with the said case accidentally out of its proper position, so that in the drawing the case is represented as not only resting upon the water-main or flange thereof below, but as coming up flush with the flange above it on the tube of the hydrant, and that while the model showed the said case as loose, because of its having an end play up and down on the hydrant, yet the drawing showed the case connecting the tube and water-main together as being confined at the top as well as at the bottom, so as not to be a loose case and as not to have such end play, and that on learning of this fact plaintiffs at once informed Bailey, who then first discovered the defect in his specification, and procured a reissue of the patent with the drawing, specifications, and claims changed to correspond with his actual invention. The bill further averred that this reissued patent was assigned to plaintiffs, and that defendants had been guilty of infringing the same by making use of a large number of hydrants containing this device. It was insisted upon the argument that defendants had infringed the first and third claims of the reissue, which read as follows:

"(1) In combination with a hydrant or fire-plug, a detached and surrounding casing, C, said casing adapted to have an independent up-and-down motion, sufficient to receive the entire movement imparted by the upheaval of the surrounding earth by freezing, without derangement or disturbance of the hydrant or plug proper, substantially as shown. (3) The combination of the hydrant or fire-plug pipe, A, supply pipe, B, valve, D, casing, C, and stuffing box, H, substantially as and for the purpose shown."

The defenses were as follows:

*First*, that the reissue was not for the same invention as the original patent; *second*, that the reissue was not taken until eight years after the original patent, and was procured with new and enlarged claims for the purpose of covering structures which had meantime been put into extensive use by these defendants and others, and which had not been embraced by any claims of the original patent; *third* and *fourth*, that the first claim of the reissue, which is the only one plaintiffs could claim as infringed, was substantially the same as the claim of another patent already held by the supreme court of the United States to have been anticipated by other devices; *fifth*, that defendants had used their hydrants for upwards of 11 years before suit was brought, and, during at least 9 years of this time, such use was fully known by the plaintiffs, who did nothing, meanwhile, to enforce their alleged rights, and who, therefore, by reason of laches, could now have no standing in a court of equity.

*E. J. Hill*, for plaintiffs.

*H. M. Duffield*, City Counselor, and *George L. Roberts*, for defendants.

BROWN, J. The most important question in this case relates to the validity of the reissue. This is claimed, in the first defense, to be invalid as matter of law upon a comparison of the original and reissued patents. By the second defense it is insisted that it is also invalid as a matter of fact,—in other words, that in procuring the reissue the patentee was guilty of laches; that there was no such mistake, accident, or inadvertence as authorized the commissioner to take cognizance of the case; and that the reissue had not been procured *bona fide* to correct any such inadvertence or mistake, but for the purpose of covering the device of Race & Mathews, which in the mean time had been put into extensive use by the defendants and others throughout the country.

It is clear that under the earlier decisions of the supreme court the second defense would be unavailing, since it had been uniformly held up to 1874 that the determination of the commissioner as to the question of inadvertence, accident, or mistake was conclusive, and that the jurisdiction of the court was limited to a comparison between the original and the reissued patents, and to the ascertainment whether there was a fatal variance between the two. The law upon this subject was thus summarized by Mr. Justice CLIFFORD in *Seymour* v. *Osborne*, 11 Wall. 516:

"Where the commissioner accepts a surrender of an original patent, and grants a new patent, his decision in the premises in a suit for infringement is final and conclusive, and is not re-examinable in such suit in the circuit court unless it is apparent *upon the face of the patent* that he has exceeded

his authority; that there is such repugnancy between the old and the new patent that it must be held, as a matter of legal construction, that the new patent is not for the same invention as that embraced and secured in the original patent."

This limitation upon the power of the court was substantially re-asserted in *Russell* v. *Dodge*, 93 U. S. 460–464, and in *Ball* v. *Langles*, 102 U. S. 128.

In the case of *Kells* v. *McKenzie*, 9 FED. REP. 284, decided in 1881, we had occasion to examine all the cases up to that time, and then came to the conclusion that there was nothing in the statute or in the opinions of the supreme court to indicate that we were at liberty to review the action of the commissioner in this particular. Such, too, I understand to be the general principle of law, applicable not only to judgments of courts of competent jurisdiction, but to the determinations of all officers acting judicially. *Hancock Inspirator* v. *Jenks*, 21 FED. REP. 911. Whether, under the later opinions of the supreme court, this doctrine is modified to the extent of permitting us to institute an inquiry into the action of the commissioner, and to determine whether there was such accident, inadvertence, or mistake as authorized him to grant a reissue, it is unnecessary to decide, since it is clear to my mind that the first claim of this reissue cannot be supported upon any theory of the law.

In the case of *Kells* v. *McKenzie*, above referred to, we followed what seemed to be the tenor of the most recent decisions of the supreme court, and held that the validity of a reissued patent did not depend wholly upon the fact that the new features attempted to be secured thereby were suggested in the models, drawings, or specifications of the original, and hence that where a patentee, in his specifications, claimed as his invention a particular part of the machine, and his claims were all limited to that part, a reissue embracing other and distinct portions of the machine was not for the same invention, and was *pro tanto* void, although the designs accompanying the original patent showed all the features contained in the reissue. Subsequent cases in the supreme court indicate that the right to a reissue should be still further restricted; but the rule adopted in that case is quite a sufficient guide to us for the determination of this. In this connection, then, it becomes important to consider of what invention Bailey was endeavoring to secure the monopoly when he applied for his original patent. In his specifications he declares that his invention "relates to a new and improved method of constructing fire-plugs or hydrants; and the invention consists in operating a cylinder valve in a suitable case, and in the arrangement and combination of parts connected therewith, as hereinafter described." Words could hardly be chosen to indicate more clearly that his invention was that of a cylinder valve in a case fitted to receive it, and in the arrangement and combination of other parts of the hydrant connected therewith. The mere *operation* of a valve would not be patentable unless the

valve itself, or the combination of valve and case, were patentable. Nothing is said regarding a loose case having an end play, and the theory of plaintiffs, that the invention may be made to consist also "in a suitable case" by inserting a comma after the words cylinder valve, is too fanciful to be worthy of serious consideration.

Following this description of his invention is a reference to his drawing, in which A is said to represent the hydrant tube, B, the horizontal section connected with the water-main, C, a loose case around the hydrant tube for protecting the tube from dirt, etc., D, the cylinder valve, E, a rod having a screw-thread on its upper end, F, a sleeve-nut, G, the head of the hydrant, H, the stuffing box, etc. Having thus described his invention, in which a loose case is merely mentioned as one of the parts of the hydrant, and having no especial value except for protecting the tube from dirt, and in which no mention whatever is made of its having an up-and-down movement, the patentee claims: *First*, a hydrant or water-plug, constructed substantially as shown and described; that is to say, with the parts, A and B, connected together as shown, and with a cylinder valve and a waste-water valve, connected and operated in combination, substantially as herein specified. *Second*, the arrangement of the parts, A, B, valve, D, case, C, and stuffing box, H, as herein described, for the purpose specified. In the drawing attached to this original there is no indication that C has any up-and-down movement, as it rests at its lower end upon the horizontal main, and at its upper end is confined by a flange which would effectually prevent such movement. In the reissued patent the description, the specifications, the claims, and the drawing are all changed, and the loose case, C, with an entirely distinct and new function assigned to it, is thrust prominently forward as the leading feature of the invention. In his new specifications the patentee says that his invention "relates to improvements in the construction of fire-plugs or hydrants," but no mention is here made of its consisting of a cylinder valve in a suitable case, or of the combination suggested in the corresponding portion of the original specifications. C is first described as "a loose, *movable* case around the hydrant tube." After having at length described the entire hydrant substantially as before, he introduces the loose case, C, as a distinct feature of his invention in the following language:

"It will be observed that the casing, C, loosely rests upon the main, B, or upon a branch projecting upward from the same. This casing extends upward, enveloping the main portion of the water-pipe, A; at least that portion which is subterranean. Said casing extends upward and fits loosely about the plug or hydrant at the portion, A. Above the upper terminus of the casing, C, is provided the bead, a, upon the hydrant proper. Sufficient space is left between the bead, a, and the upper terminus of the casing, C, to permit of sufficient up-and-down play of the said casing, C, for the purpose which will hereafter more fully appear. This distance between the bead and casing may be adjusted to any described distance, thus lengthening or shortening it by means of its screw attachment at its base.

"The main function of the casing, C, is to prevent derangement of parts

during cold weather by the ground alternately freezing and thawing around the hydrant or plug. This process of freezing causes the surrounding earth, by its expansion, to lift or upheave, and thus be liable to derange the hydrant or plug. This upheaval or movement is received by the casing, C, which, by its capability of sliding loosely up and down, will accommodate the upheaval of the earth above mentioned, without any liability to derange the plug or hydrant. This is the chief function of the casing, C, although it likewise serves the purpose of protection to the water-pipe, A."

A new and distinct claim is also introduced as follows:

"(1) In combination with a hydrant or fire-plug, a detached and surrounding casing, C, said casing adapted to have an independent up-and-down motion sufficient to receive the entire movement imparted by the upheaval of the surrounding earth by freezing, without derangement or disturbance of the hydrant or plug proper, substantially as shown."

The drawing attached to his specifications is also changed, so as to give sufficient space between the top of the loose casing, C, and the flange above it, to allow an end play of the casing of several inches. From this comparison of the two patents it seems to us entirely clear that here is not only an expansion of the original claim, but an attempt to introduce an entirely new invention, neither claimed nor suggested in the original patent. It is scarcely necessary to say that this cannot be done.

The plaintiff's argument, that the words "with the parts, A and B, connected together, as shown," used in the first claim of the original patent, referred to the connection made by the loose casing, C, is wholly untenable. This casing surrounds the stock or hydrant tube, A, and rests upon a shoulder projecting from B, but it can no more be said to connect them than the ramrod of a musket can be regarded as connecting the stock and barrel, simply because it runs loosely through loops in the one into a hole provided for it in the other. When we speak of the connection of two parts we mean that device by which they are held together; and the connection referred to in this claim is defined by the specifications so clearly as to leave no doubt as to what was passing in the mind of the inventor: "The tube, A, is secured to horizontal section, B, by a ring-nut, M, which contains recesses," etc. As this is the only connection referred to in the specifications, the claim must be construed with reference to it. The telescopic casing, C, is, with reference to this device, at least, no connection at all. It is true that the joints of a telescope are said to be connected together, although the connection is, to a certain extent, a loose one. But in fact these joints are held together by flanges, which prevent a total disconnection without unscrewing or breaking the instrument. This illustration obviously has no application here. A glance at the drawing, too, shows that the casing, C, has no up-and-down play at all, but is confined at the top by a flange projecting from the stock. Indeed, the bill avers that this perpendicular movability was a feature not shown in the drawing. "Yet the said drawing showed the said case, though forming a part

of the hydrant, connecting the tube and water-main together, as being confined at the top as well as at the bottom, so as not to be a loose case and as not to have such end play." The only function of this casing was that described in the specifications, viz., the protection of the hydrant from the surrounding earth or dirt. In the drawing annexed to the reissue, however, there is given to the casing an end play of several inches by widening the space between the top of the casing and the flange of the stock.

We find nothing, then, in the original patent which lends support to plaintiff's theory that Bailey was the inventor of the loose casing described in the reissue, and we are therefore of the opinion that the commissioner had no jurisdiction to grant such reissue.

But conceding, for the purpose of this case, that we may re-examine the decision of the commissioner as to the question of mistake or inadvertence, the evidence tends only to show that Bailey was, or may have been, the first inventor of the loose casing having an up-and-down movement, and that the model forwarded by him to the patent-office embodied this invention. The mistake, then, was that of his attorneys in preparing the original drawings and specifications. There is no evidence that he was mistaken or misled as to the legal import of his patent, or that he intended to claim more than he did claim. Unfortunately the model was destroyed by a fire in the patent-office, and there is no direct testimony that it did, in fact, exhibit an up-and-down movement, except that of the inventor himself, who says that during the winter of 1866–67, or the spring of 1867, he made two models, one of which he sent to Munn & Co., his patent solicitors in New York, and the other of which he produced and put in evidence as "Exhibit Bailey's Original Model." He testifies in general terms that there was no difference between the two, but he does not undertake to compare them in detail, and the lapse of sixteen years and a half since the model was constructed certainly affords a basis for an argument that he may be mistaken in his recollection. Two other witnesses testify that they saw the two models, and that one of them was the exhibit; but neither of these witnesses undertake to describe in detail the one which became the patent-office model, nor to say that it was a duplicate of the exhibit in every material respect. Their attention does not seem to have been called to the peculiar feature which is now made the basis of the plaintiffs' claim. Whether this model did, in fact, exhibit this end play is not proven to my mind with that clearness which we should regard as necessary to establish such an important fact, in the face of Bailey's other testimony with respect to his procurement of the original patent. It is true that the duplicate, "Bailey's original model," contains somewhat less than an inch of end play, but this is effected, to a certain extent, at least, by the employment of leather washers, apparently superfluous in number and of unusual thickness, in the screw connection between the stock of the hydrant proper and the branch of the water-main. Indeed, it is

stated by Bailey himself that, when the metal parts are screwed together without leather washers, the space left for end play of the casing, between its stock and the bead on the body of the hydrant, is only 3-32 of an inch.

But, admitting that his testimony with regard to the patent-office model should be taken for all that can be claimed for it, there is nothing to show that Bailey did not secure to himself all of which he intended to claim the monopoly of manufacturing and using. His letters to his attorneys, Munn & Co., were also burned, and there is no attempt to show by parol the instructions contained in them. Bailey simply says that his recollection is that he wrote them about it, "giving them my idea of it sometime previous, I think a month, to the forwarding to them of the specifications." There is no evidence from the office of Munn & Co. as to what their instructions were, or whether the model sent to them contained the up-and-down movement or not. We can only say with respect to this branch of the case that, if the patentee intended to claim a loose casing around the hydrant, he would, in all probability, have so instructed his solicitors, and if he had done this, it is incredible that they should have so completely neglected his instructions in this important particular, and that when he signed the specifications he should have failed to notice the omission of the principal feature of his invention; and that he should have held possession of the patent for eight years without discovering the defect. He testifies that he read the specification which he executed and sent to Munn & Co., September 7, 1867, before he signed and swore to it; that he received his patent within two or three days after its issue upon March 10, 1868, and then read it, but did not examine the drawings, because he did not consider them an important part of his patent. It was not until eight years afterwards, when he saw hydrants made by the plaintiffs in use in Saginaw, that he recollected that his own device contained a perpendicular movement embodied in a subsequent patent granted to Race & Mathews.

There is also evidence that when Race & Mathews applied for their patent in December, 1868, they were informed by the examiner that a rejection was declared with reference to Bailey's hydrant, the model of which showed the whole invention of the loose casing claimed by Race & Mathews; but the examiner who wrote this letter is dead, and the letter itself is wholly inadmissible as evidence. The history of the reissue is substantially this: In 1875, Bailey being at Saginaw, Michigan, where hydrants made by the plaintiffs were in use, and learning that the city had been threatened with prosecution by R. D. Wood & Co., the present owners of the Race & Mathews' patent and the real defendants in this case, returned home and wrote to the plaintiffs that Mathews had no patent on a loose case, but that he (Bailey) had one patented in 1868, saying: "If you will look up this matter, and satisfy yourselves that my claim is good, I will sell

to you, or go in with you to make Mr. Mathews stop his noise." Soon after, at their request, he sent his patent to the plaintiffs, who submitted it to their counsel in Cleveland, Messrs. Leggett & Co. These gentlemen, seeing the defect in the specifications and drawing, wrote to the patent-office, and upon receiving a reply advised and obtained a reissue, with new specifications and drawing. The patentee (Bailey) seems to have had nothing to do with the matter of procuring the reissue, beyond signing and swearing to the application after it had been prepared and sent to him for that purpose by the attorneys who were acting for the plaintiffs.

In the mean time, and before this reissue was obtained, a loose casing similar to the casing, C, described in the reissue, had gone into extensive use throughout the country. In the year 1867, and more than six months before Bailey filed his application for the original patent, the Niagara Manufacturing Company, of Lockport, New York, was engaged in manufacturing and selling hydrants provided with an outside casing having an end play, and apparently embracing the very invention claimed in the reissue. This company, it appears from its books, sold, during the year 1867, 516 hydrants embodying this device, and of these 367 were sold before the date of Bailey's application. In the summer of 1868 the company failed, and for about a year thereafter the business was carried on in their shop by one of their creditors, and again for about a year longer by Samuel R. C. Mathews in the city of Lockport, making in all four years of such manufacture up to the spring of 1870. Meantime, in November, 1869, Race & Mathews obtained a patent for an improvement in hydrants, which embraced the same invention of an outside case with an end play; and, from the spring of 1870 down to this time, the manufacture of such hydrants has been carried on by Mathews, in copartnership with R. D. Wood & Co., at Philadelphia. Some eight or nine thousand of these hydrants were manufactured by them up to the date of the reissue of the Bailey patent, and since then, up to the beginning of this suit, about twelve or fourteen thousand more. In November, 1867, Bailey obtained permission from the common council of the city of Lockport to put in one of his new patent hydrants, which was subsequently taken up. Between this time and August 16, 1869, four or five more of these hydrants were made by Bailey, and these, with the one first mentioned, were all which were ever manufactured by him, or by any one with whom he has been connected in business.

Under all the circumstances of this case, and conceding that Bailey was the first inventor of the loose casing which is the main subject of this suit, it seems to us that his omission for this period of eight years to obtain a correction of his patent operated as a dedication to the public of all which was not claimed in the original. It would ill become a court of equity to incline its ear to the prayer of one who has been guilty of such gross laches, and is now seeking

to set up a practically abandoned claim to the prejudice of others, who, deceived by his silence and apparent acquiescence, have introduced his device into many of the leading cities of the country.

The language of Mr. Justice BRADLEY in delivering the opinion of the supreme court in *Miller* v. *Brass Co.* 104 U. S. 350, is exactly pertinent to this case:

"But it must be remembered that the claim of a specific device or combination, and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed. It is a declaration that that which is not claimed is either not the patentee's invention, or, if his, he dedicates it to the public. The legal effect of a patent cannot be revoked unless the patentee surrenders it and proves that the specification was framed by real inadvertence, accident, or mistake, without any fraudulent or deceptive intention on his part; and this should be done with all due diligence and speed. * * * It will not do for the patentee to wait until other inventors have produced new forms of improvement, and then with a new light thus acquired, under pretense of inadvertence and mistake, apply for such an enlargement of his claim as to make it embrace these new forms."

If this language may be used with references to devices or combinations apparent upon the face of the patent, with much greater force may it be applied to a claim which was not even suggested in the original patent or in the drawing annexed thereto, and was only shown by a model preserved in the archives of the patent-office, the existence of which could only be learned by a search instituted for that purpose.

The third claim of the reissue only remains to be considered. This is for a "combination of the hydrant or fire-plug pipe, A, supply-pipe, B, valve, D, casing, C, and stuffing box, H, substantially as and for the purpose shown." It is substantially a restatement, in somewhat more specific language, of the second claim of the original patent. We have already expressed the opinion that the invention claimed in the original patent was that of a cylinder valve operating in a suitable case, in connection with a waste-water valve. If this be the proper construction, then defendants are not guilty of an infringement, inasmuch as they make use of a puppet valve in place of the cylinder valve, B, unless the puppet valve can be treated as the equivalent of the cylinder valve. But if the two valves be treated as equivalents for each other, (and we are inclined to think they ought to be,) then the combination is destitute of novelty, for in all the hydrants exhibited there is an upright stock, A, hydrant tube, B, a horizontal section, B, a valve for turning off and on the water, a stuffing box, H, and a loose casing for protecting the hydrant from the surrounding earth. In the New York hydrant it is a mere wooden box covering the entire hydrant. In the Race & Mathews patent of 1858 it is a tube loosely inclosing the hydrant tube, but held at the top by an overlapping flange. In view of the opinion we have already expressed regarding the first claim, we think the patentee

should be confined, in the construction of this claim, to such a loose casing as is exhibited in the drawing attached to the original patent, viz., one wherein the end play is confined by an overlapping flange, and, thus interpreted, the claim is anticipated by the Race & Mathews patent of 1858. It results that the bill must be dismissed.